Good morning, your honors. May it please the court, my name is Timothy Scott for the appellate Ronnie Johnson. I'll be arguing the cause for both Mr. Johnson and Mr. Pritchard with the court's permission, and I'd also like to reserve three minutes for rebuttal. The first reason this conviction should be reversed is that the district court instructed the jury that, quote, the government's investigation is not on trial here. And it specifically corrected the defense attorney who was trying to argue reasonable doubt from the absence of evidence that the government produced in the case. Simply put, that was error because the government's investigation is always on trial. That's specifically what reasonable doubt and what the burden of proof are designed to protect. The fact that the defendant does not have to affirmatively produce evidence, the fact that it is the government's burden to produce specific evidence, and that if they fail to do that, if there are certain things that they didn't bring that they could have, then the jury can consider that absence of evidence in deciding whether or not reasonable doubt exists in the case. So are you claiming that's structural error? I am. Why? The reason is any instruction that reduces the government's burden of proof or that inverts reasonable doubt, diminishes reasonable doubt, is structural error under Supreme Court case law. I had cited to the Sullivan v. Louisiana case and the Cage v. Louisiana case. In going back and looking at those cases, the reasonable doubt instructions in those cases were not as deficient, arguably not even as deficient as the one that was given here. In that case, the problem was that the trial court had added whether there's grave doubt or whether there's substantial reason for doubt. But in this instance, the actual instruction was not a problem. I mean, the instruction in the ordinary sense of instruction was not a problem. The generic form instructions. Right. And this was a somewhat offhand comment. How many days earlier? Well, it was during closing argument. And so it was... Oh, I see. So it was not that much earlier. So it would have been on the same day that the... And in fact, didn't the defense lawyer go on at some length to argue about the government's investigation and not get stopped again? Well, he began to make that argument that there was evidence not produced that should have been considered when he was told no. And then... And in the very next sentence he kept doing it. I think that, if that's true, let's assume that he was able to continue arguing that. He's essentially arguing directly contrary to what the judge just instructed the jury. And so even if we assume for the sake of argument that there was other evidence that came in, either on cross-examination or that he was permitted to make those arguments in closing, he's still making arguments that the jury has been specifically told to ignore, in essence. And so what we have is the defense attorney trying to make what are lawful and appropriate arguments, but he's making it in a context where the judge had just told the jury. So is your complaint... He said two things. He said something about you have to decide based on the evidence that's before you. And then he said the government's investigation isn't on trial. Yes. Are you complaining about one or both of those? Both of those and all of those. But the first of them was he didn't really exactly... All he said was something like, as to the evidence, was that what he shouldn't... It was somewhat inscrutable. It was not... This jury is to make decisions on what evidence was presented in this courtroom. And that's right, including what evidence... That doesn't say you can't talk about what evidence wasn't in the courtroom. So that doesn't seem to be a problem. Well, I think it is a problem, respectfully, Your Honor, because it was in direct response to the defense attorney saying, Jury, I would ask you to consider obvious evidence that wasn't presented. And it was in response to that that we received the sua sponte instruction, No, the government's investigation is not on trial here. The defendants are. And I think that both of those statements are inaccurate in the context of correcting defense counsel's argument. Because, as I said, the government's investigation is quite literally on trial. It always is. That's what the burden of proof and proof beyond a reasonable doubt requires, for the jury to put the government's investigation on trial and determine whether that constitutes proof beyond a reasonable doubt. I think it's also important that we're not suggesting that the jury should speculate about the specifics of evidence that's not being presented. There's a distinction between considering the fact that certain evidence wasn't presented versus asking the jury to speculate on what that evidence is. And so I guess arguably it's true as far as it goes to say you can't speculate on evidence that isn't here. But it's inaccurate to say that you can't weigh the absence of that certain evidence in determining whether or not the government has proven their case beyond a reasonable doubt. But to go back to Your Honor's initial question, that is structural error because The reason I say that, and I understand the Supreme Court case law, but this isn't quite like those cases. We don't have a crisp instruction. What we have is a series of events that might lead the jury to conclude that the burden was different. And is there a case that you found you think is closest to this circumstance that would indicate structural error? In terms of structural error, I think that Sullivan and Cage are the best that I can present. They were also specifically told in the actual instructions that they could consider the failure to produce witnesses or evidence and that the government had a burden of proof on every element beyond a reasonable doubt. So in terms of, I mean, you could either view that as a cautionary instruction to disregard what I said before, but whatever. In the actual formal instructions, it was perfectly clear on this particular point, not just with regard to reasonable doubt in general. Right. The problem with that, quote, unquote, curative instruction is threefold, I think. The first is mainly factual in that the instruction that you can consider the lack of evidence was actually buried in a paragraph that taken in total. And this is on page 506 of the ER. The beginning of that paragraph tells the jury that the government does not have to produce every witness or each piece of evidence that might bear on a particular issue. And the jury was told that this may be time-consuming and of no real value. And so it strikes me that the sort of overall premise of that paragraph, it's to say in actuality the government need not produce all the evidence that they might otherwise produce. And I grant that there is language that you can consider the lack of evidence, but it's later in that same paragraph. And so overall, I think that if anything, it suggests to the jury that the government doesn't have to produce everything that they should, which doesn't do a great deal to correct that error. So that's the first problem is that factually I don't think it's as strong a contradiction as the government would make it out to be. The second is more of a legal concern in that merely contradictory instructions cannot cure one another. That's the Francis Supreme Court case, and that's the Lewis Ninth Circuit case. The rationale to that being that if a court is unable to determine, did the jury consider Judge Reel's specific admonishment during closing or did the jury rely on the generic reasonable doubt instruction that he gave later, there's really no way to tell which one they embraced and which one they ignored, they being the jury in this case. And so for that reason, we're unable to say, yes, the jury must have discarded the second one. The third concern with that is that when we're talking with a curative instruction, and the reason I said the curative should be in quotes, is that a curative instruction by definition should identify what the error is and then specifically lay out for the jury what was wrong and what they should consider instead. For example, in the Perlazza case, which I cited to the court, there was a concern about whether there was a presumption of guilt once you get into the jury room. And this court held that because the district court didn't specifically identify that earlier error, tell the jury specifically not to consider that error, but rather to rely on the second instruction, then that curative was insufficient. And this case is at least that bad in the sense that the court never acknowledged that there was any error or any concern with the government's investigation is not on trial issue. So for each of those reasons, I would argue that that deficient reasonable doubt instruction or burden of proof instruction should alone be enough for reversal. But that's not the only issue. The second reason why the conviction should be reversed is that the defense was not permitted to cross-examine cooperating witnesses on the specific benefits that they were receiving under the plea agreement. The first instance of that appears at page 584 of the ER. The defense attorney was able to introduce the plea agreement for cooperating witness smart and had a very brief opportunity to begin to lay a little bit of foundation about the plea agreement. But the trouble started when the defense attorney tried to specifically point out what kind of a sentence the cooperator was facing and then what benefit he stood to gain from his cooperation. The district court specifically, again, this is a sua sponsae court's own objection and extemporaneous instruction to the jury. The district court said explicitly that this man is not here for sentencing and whether he's facing X sentence or Y sentence is, quote, totally irrelevant, totally irrelevant, the repetition being the district court's, not mine, in considering his testimony. He, being the district court, told the jury that he's here to testify about what he saw and what the facts were and that his whatever benefits he stood to gain were, again, quote, totally irrelevant to consider. The significance of that is that under the Schoenberg case and under other cases of this court's jurisprudence is that the defense is entitled to Well, what he actually said was totally irrelevant was whether he actually brandished a gun or not. He said it's totally irrelevant because he's not here for sentencing. The colloquy, I think, was that the Well, he wasn't saying that the benefit wasn't irrelevant. He was just saying the brandishing of the gun wasn't relevant. But it's the brandishing of the gun that confers the sentencing benefit. What he actually said was it was totally irrelevant to his situation in terms of punishment. So he didn't say it was irrelevant to his sentence. He said it was irrelevant to that his sentence was irrelevant. He said what was irrelevant was whether he actually brandished the gun. But the benefit that he was getting was that they didn't charge him with the 924C in exchange for his cooperation agreement, and that's what Were you the trial counsel? I was not. Well, the trial counsel was not able to bring it out. And what I'm wrestling with was whether the trial counsel was not able to bring it out because he didn't question about it in a precisely correct way that would have addressed directly the benefit. Instead, he was asking about the brandishing. And I think from the transcript, it looks like that's what Judge Real was reacting to. Well, I think the chronology that I think was what the trial counsel had in mind was to And we have to speculate somewhat because it was curtailed. But I think the logical inference from the record is that the trial counsel was trying to establish first that there was brandishing. And that's on page, I think it is, 8 of Defendant Smart's plea agreement, Exhibit 69 of trial. He acknowledges that a plus 5 guideline adjustment applies because he brandished. So factually, there was brandishing. Okay. And he was then trying to show, and if you brandish, the government can give you seven additional years under 924C. And that's when things sort of fell apart. So that's what's troubling is that the cross-examination was cut short of being able to actually show the full extent of the benefit that the witness was receiving. That's the heart of the argument. And I would note that I think defense counsel, although you can always go back and wonder perhaps if it should have been phrased slightly differently, but to his credit, he did at the next break try to take this issue up with the judge. But he also said in this plea agreement, the government agrees not to indict you for using a firearm during the robbery. Correct? Yes. So he did bring that in. Well, he brought that in, but he wasn't able to show what that means, specifically the seven-year minimum mandatory savings that he was giving there. I see. So your ultimate focus is that, because it came back at the closing argument that he didn't know how much that was. He didn't know how much savings that was supposed to be. And I think that's why Schoenberg is particularly applicable, because it's the language about not just that there may be bias, but the extent of it, why it is that he's receiving such a benefit. So is this, do we review this under the harmless, constitutional harmless error standard? For the limitation on cross, yes. I would argue not for the government investigation on a trial. I would argue that's structural. But as to this one, I would concede that that is a harmless error analysis. And I don't think the government can meet that here. If we look at the closing argument that the government made, and it begins on page 436, and I tried to lay this out in the briefs, but fact after fact after fact that the government relied upon in closing came exclusively from the cooperating witnesses. Absent the cooperating witnesses, the government could demonstrate that there was DNA belonging to Mr. Johnson and Pritchard in the car, but they couldn't put them in the bank. They couldn't explain whose role was what. They couldn't do anything other than point to the DNA in the car to show that there was a, what the defendants did in the case. And so given the closing argument, given the state of the evidence, and I tried to point out even in the way that the government writes their response brief, if you redline the portions that you have to rely on the cooperators for, the government's left with relatively little in the way of proof against the defendants on trial. And although it is a harmless error standard, because it is a constitutional issue, the Sixth Amendment right to cross, the standard would be harmless beyond a reasonable doubt. So what should have happened here? I mean, here you had a defendant who, at least as he was portraying it, didn't think he got such a good deal because he thought it was erroneously that he couldn't be guilty of the 924C. You've got to cross-examine him about that. So is the real problem that the judge should have allowed the judicial notice with regard? I mean, I think your point about not knowing how much the 924C is pertinent and did turn out to matter in the closing argument, but it couldn't have come out through this witness because he wasn't going to give on it. I think the first thing that would have happened that would have been helpful is that the witness would have been permitted to be impeached. It is an initial matter. You mean impeached by saying you did brandish the gun or impeached by saying, you know, this is seven years and this was a big deal, or impeached by saying what? Impeached first by saying that this is a benefit that he got in the plea agreement because he wouldn't even agree with that first premise. Well, how was he going to agree? He didn't agree with it. He didn't agree with it. He didn't agree with it. He didn't agree with it in court, but he had also said in prior proceedings that he had reviewed the entire plea agreement with his attorney. He understood the terms. He signed the last page and initialed each page. And right there in black and white in the plea agreement, and this is on page 11 of Exhibit 69, the government specifically agrees that he won't be charged for the 924C. But he thinks it's worthless. I mean, he's standing up there saying he wasn't denying that it happened. He just said it wasn't worth anything to make. He said it wasn't worthless. And I think that it's worthy of a fair bit of skepticism that despite this being in black and white in his plea agreement, he wanted to say that, no, that's not true. So he should have initially been impeached with the fact that he already agreed that this is a benefit that he received. Right. But it was a logical chain, and the chain of examination got interrupted. But what I took from the cross-examination anyway was that the jury understood he was getting a benefit from testifying. They didn't know how much of a benefit. But I don't think either he didn't know how much of a benefit it was or he was fudging. We don't know. Yeah. I'm not sure. But I'm not sure that's relevant to an impeachment necessarily. I'm not sure that the jury was left with that opinion because Co-operator Smart, in particular, said repeatedly that certainly he's hoping to get a better deal, but that that would be the case either way. And he actually said on at least one occasion that he didn't think that the government's recommendation was necessarily going to carry the day anyway. So I would suggest that in the big picture, I don't think that Co-operator Smart was that forthcoming about the benefits that were actually received. I see about a minute 30 left. Yeah. Do you want to reserve? I would like to unless the Court has a question I can't answer. Okay. And we know you have other issues, but we won't lose track of those. Okay. All right. Thank you, Your Honor. Good morning. Andrew Stolper on behalf of the government. I was trial counsel for both the first trial and the second trial. And because of that, there are a few, I think, important factual realities that need to be pointed out that were not, I think, carefully briefed. First, Your Honor. Were not carefully briefed by? By either party. It was confusing. The record was a little bit confusing. And I say that because there were two trials. And the issues that had been raised by the defense, the instructional error and the claim for the curtailment of the Cooperator Smart's testimony, those are unique to Trial 1. There's no claim of instructional error during Trial 2. There was no sua sponte interruption by Judge Reel during the second trial of Mr. Pritchard alone that raises any question concerning reasonable doubt. So that issue is just. That was only on one count, wasn't it? That was at the claim. It was only on one count as to the 924C. The jury in the first trial hung as to Mr. Pritchard on the 924C count. And so that claimed error just doesn't exist and should not be an issue in Trial 2. Similarly, the claim curtailment of Cooperator Smart's testimony is also unique to Trial 1. There's no claim in the briefing about that issue taking place in Trial 2. And when I say that we weren't clear about that, we should have been more clear about that because that's an issue. But all I get you is that Pritchard's 924C claim is not a problem. Correct, Your Honor. Okay. Which is obviously significant to the government. Also, I'd like to point out in response to something we just heard. Well, wait. Just a question. Does the 924C claim, though, depend verdict, depend on the other verdict? It does not, Your Honor. And I direct the Court, the Court asked during the second trial whether or not it should instruct that the first trial, that there was, in fact, a crime of violence. And the government asked that it not, and the Court did not instruct the second jury as to anything related to the first trial. So the first, the second trial is totally independent. The second jury considered whether or not there was a crime of violence. In this case, the only crime that could have been was the bank robbery. And so that second trial is removed from those two issues. So everything was retried in terms of what Pritchard actually did? That's correct, Your Honor. The 924C was retried. The government had to establish during the second trial whether or not there was a crime of violence. The Court asked if it should instruct about the previous verdict. The government said no. And there was no mention of the – I don't believe there was any mention of the first trial during the course of the second trial. I think there – to the extent there was any impeachment, I believe it was called the prior proceeding. I'd also like to point out that the argument here today I think confounded cooperators. And I say that because there were two cooperators, and the claim limitation of the – the claim limitation on the cross-examination that the defense is making is limited to cooperator smart. Right. But that – the related NAPU error is smart as well, correct? Well, they're smart understanders. Right. And the claim is that Judge Real, sua sponte, and improperly limited the cross-examination as to smart. And then from that, what the defense does is they go through and they black out portions of the factual basis of the government's factual evidence. You mean smart during trial one or trial two? Smart has to apply during both trials. Okay. But this claimed error is trial one? Correct. Okay. So did the jury ever learn through evidence what the mandatory minimum sentence was that smart was facing that was the benefit of the deal that he did with the government? It did a number of different ways. I'll go through them. First of all, the government – the defense introduced Mr. Smart and Mr. Sanders plea agreements. Those both went back to the jury. It doesn't – it says, okay, the government agrees not to charge with none. It – respectfully, it says more than that. Mr. Sanders pled guilty to the 924C. As such, it identifies – We're talking about Smart. No, no. I'm talking about Mr. Sanders. Mr. Smart's benefit was he didn't get charged with the 924C. Right. Mr. Sanders, who also testified, did plead guilty to 924C. In his plea agreement that went back to the jury, it contains the statutory minimum and the statutory maximum for 924C. And certainly that would have required a fair amount of trolling. And in the – well, yes, because it required them to look at Sanders' plea agreement to understand Smart's plea agreement, and it required them to – where they had no particular reason to be doing that. I mean, it was – you recognize that, but why would they recognize that? In order to figure out what Smart's plea agreement really was about, they had to look at Sanders' plea agreement. Well, they also heard – I understand, Your Honor, and certainly the defense lawyer was free to take that plea agreement and say this is the penalty for 924C. But in fact, what he said was it never actually came out. Well, it didn't come out with Defendant Smart, but Defendant Sanders then took the stand and was cross-examined. And he was pleading guilty to the 924C. He thought the defense lawyer wasn't clever enough because instead of – I mean, he was very careful in the closing argument to say, well, you never really found out how much it is, but it was a lot. We could assume it was a lot, something like that. And he should instead have extrapolated from one to the other. Well, I don't think it's – the question is, was it before the jury? And the answer is yes, it was before the jury. And the defense lawyer had that information. I mean, it came in evidence. But you're saying it came in through Sanders. He wasn't able to say – what he was trying to show was Smart's bias and explain the full benefit of the bargain Smart was getting. And why couldn't – I mean, what the judge did was just wouldn't – he wouldn't let him do that. Well, what the judge wouldn't let him – Mr. Smart said he didn't believe that he got a benefit from the 924C. You know, it seems kind of arbitrary what the judge did there. He just cut him off, which I've seen this judge do many, many times. So he cut off the defense in questioning. Why is it not – why is it – I mean, I think you should argue harmless error. Well – Why is it not harmless? I guess it's not harmless because those facts were in front of the jury. Perhaps, but I think – I think it's also not harmless because Mr. Smart said – his testimony was, I don't think I got a benefit from this at all. But he clearly got a benefit, and certainly the prosecutor, you – you knew he was getting a benefit, right? We did, and that's one of the reasons we permitted the plea agreement to go in. And I – one of the things that was said during argument was that Mr. Smart was, in fact, impeached by that plea agreement. He was impeached by that plea agreement during the – it was in evidence, and the defense lawyer impeached him by saying that he contradicted what he admitted in his – in his plea agreement. And I direct the court to – I had it a second ago. I apologize. Starting at Page 491, the defense lawyer – sorry, volume two, page 458 to page 463. The defense lawyer, Mr. Pritchard's counsel, who is the one who was purportedly shut down by Judge Riel in the 924C issue, asked the jury to, quote, read every word of the plea agreement, of both plea agreements. And then he went on, I believe, at Page 463. Yes. So where are you? I'm at Page 463 of the first – Page 463. Here's what was argued. The last two pages of the agreement say, and I read this agreement and carefully – I read this agreement and carefully discussed every part of it with my attorney, and I understand the terms of this agreement, which is exactly the opposite of what he said on the stand. He said he didn't understand. So Mr. Smart was impeached by his own plea agreement, which was in evidence. Right. But I have to say, the questioning, instead of just a clean cross-examination about what the benefits he was potentially getting, just turned off – turned into a muddled mess. And here's a witness who then says he didn't get a benefit, and the defense counsel isn't allowed to impeach him right there on the fact that he did get a benefit. He said, I didn't brandish the gun. And he tries to prove that he's a liar, which, of course, he's entitled to do at that point. And he's not – he's stopped at the gate on that. Mr. Smart didn't brandish a gun. And that was the point. Mr. Smart didn't admit on this factual basis that he brandished a gun. Right. But what he could have done at that point, had he not been cut off, was to point out – to say, yes, but didn't you – well, first of all, didn't you – doesn't your plea agreement say that you're not being charged with this and isn't it a seven-year term? And didn't you admit to brandishing a gun for a different purpose? And he'll say, well, I didn't really do it. And he'll say, yes, but didn't your co-defendant do it? And so on. And weren't you told by your lawyer that that day you could have been charged for that reason? Or don't you know? The frustrating part for the defense lawyer was that – It's not just frustrating. It's that the judge cut him off in bringing out – I mean, in impeaching this – I mean, I – from this transcript, it seems to me Smart was lying. I mean, it just – he's lying. He knew he got a benefit from that. And he's trying to say that he believed he couldn't be guilty and make up some reason for it. I understand what the Court's saying. Where I would respectfully disagree is the way this cross-examination flowed was the defense lawyer said, you brandished a gun. And he said, no, I didn't. Then he turned to Mr. Smart's plea agreement, the portion in the guideline calculation, not the factual basis, the guideline calculation where he was given an enhancement for brandishing a gun. Now, in truth and in fact, Mr. Smart did not hold the gun. He's not the person who brandished it. He was – by co-conspirator liability, aiding, abetting, Peterton, whatever, he's certainly responsible for that. But you're asking a witness as a matter of fact, did you brandish a gun? And he says, no, I didn't. He was therefore – you know, he was therefore misleading to the jury to attempt to impeach him by looking at his plea agreement and saying, well, here, there's an enhancement for brandishing a gun. And the district court, I think, correctly shut that down because it was attempting to mislead the jury into believing that because he agreed to that particular enhancement based upon co-conspirator liability, that he was in fact the person who held the gun. But that's not true because that's also why he would have been liable for the 924C. It wasn't misleading. It was misleading to suggest that Mr. Smart was – when Mr. Smart is asked, did you brandish the gun? But he also said, therefore, I didn't get a benefit because this didn't do me any  And so that's why he was not charged with that. There's no – as to the 924C, there's no question Mr. Smart was mistaken about whether or not he received a benefit. But that fact later came out in the form of his plea agreement coming in where he signs in black and white the benefit. He's – in black and white goes back to the jury. It says, I'm getting a benefit for the government not charging 924C. And the defense lawyer impeached him during his argument with that document, which was in evidence. But coming back to the original – Sorry, how did he impeach him? I thought he was cut off, essentially. He was – Mr. Smart was cut off during his cross-examination. Mr. – the defense lawyer was stopped from going forward during his cross-examination. So the only impeachment was the document. Which Mr. Smart signed. Right. But he wasn't able to get Mr. Smart to agree that, in fact, this was in his – I mean, there's something different from having a piece of paper and being able to argue from it and having a witness say, well, you know, I – yes, I said I didn't do me any good, but it is down there in black and white that this was a base – one of the things that I did get from this. And why would – why would your attorney have agreed to this if it didn't do you any good and so on and so on? You would have made him out to be, if not a liar, at least an unreliable person. I understand what the Court is saying, but the reason the Court stopped this examination or this – even the defense lawyer did come back to 924C later, but the reason it was stopped, at least temporarily, was because the defense lawyer was attempting to improperly impeach a factual – a factual statement by the witness, I did not brandish a gun, with a legal part of a plea agreement. But that's when he tried at the bench conference to get at least a judicial notice of what 924C said it actually was, and he didn't get that either. He – at the – at the bench conference, the Court asked for an offer of proof. And what – instead of getting an offer of proof, what he got, what the Court got, was a request for judicial notice as to what 924C was. And it wasn't – and it wasn't – it wasn't given, and I think rightfully so, but regardless, it's – this all, I think, falls squarely into the harmless category because what a 924C was came out minutes later. I suppose. But, you know, in the enduring course, if the judge had just let – let him go for a – for a bit, you would have picked it up on redirect and – and cured up any misapprehensions that they had. The point – what seems to me is that the witness says, I didn't get a benefit, and then he's trying a roundabout way of showing that he did get a benefit or perhaps, as you suggest, maybe he was trying to show that he wasn't – wasn't telling the truth. But we – he just got stopped completely on that, and the jury was left with the impression at that point and to be impeached later with a piece of paper that, you know, he didn't – he didn't think he was getting a benefit. And his subjective views are actually pretty important because that's the idea of why are you testifying? And if he doesn't get a benefit, you know. I – I understand. I understand what the Court's saying. But the reality here is what the defendant said was he didn't believe he was getting a benefit. The impeachment would have been after he's already testified, well, in fact, you are getting a benefit. But that problem is linked into the other issue about the judge appearing to chastise the defense counsel repeatedly in terms of saying what you're saying is totally irrelevant. It's not, you know, implying that the defense counsel is doing something wrong. The defense counsel wasn't doing anything wrong. He was simply trying to impeach a witness. I respectfully disagree that the defense counsel was not doing something wrong on this, and here's why. When the witness says, as a factual matter, I didn't brandish or hold the gun. That's not all he said. He actually goes further, and the – I mean, the witness is smart. He's very smart. He picks up on what the judge is saying. The judge says, this isn't a sentencing proceeding. Go down, that's for Santa Ana. And then smart – and then the counsel says, and you believe that when somebody actually has a gun in their hand, they're going to get more time than someone who does not. And smart says, I can't say that. I don't – I never gave nobody a sentence. I don't know. So he – I mean, between the witness and the judge, I mean, the judge is almost facilitating smart being evasive and not answering the question truthfully. Again, Mr. Smart had already said before the judge had said anything, I don't believe I got a benefit from this. That's my recollection of the record. But coming back to what Your Honor said, the – He said he did not know. I did not know. I was eliminating 84 months. Right. He also stopped him from answering the question with regard to the – to extra brandishing points. That is, he – it was – not only couldn't he be cross-examined by the 924C. You said he came back to it. He tried to come back to it. But in fact, he was stopped at that point, too, with regard to the brandishing of the firearm for enhancement purposes. And I think the reason comes back to what the defense lawyer originally did, which goes to Judge Wardlaw's question, which was what the defense lawyer was doing was not improper. And what Your Honor said, which is I would have just come back and redirected or my colleague would have fixed up and redirected, it would have been very hard to, because that would require explaining to the jury through a witness who obviously was not testifying to any knowledge of the law. But he said to him, look at page 8, line 10 of the agreement, which is a – I suppose where he said that he was going to have an enhancement for brandishing a firearm, right? Right. And then the Court says, no, you can't ask him that. And the reason why is that would have been completely improper impeachment. What he's – what Mr. Smart said was I didn't brandish the gun, and his factual basis is consistent with that, his testimony is consistent with that. And what the defense lawyer is trying to do is make it appear to the jury that he did brandish the gun, that his plea agreement is inconsistent with that, when it's not. His plea agreement is assigning responsibility for somebody else brandishing a gun as is appropriate. But the whole notion here is not what the fact of whether he brandished the gun or not. It's whether he got a benefit in the plea agreement for testifying. And that came out, that he got a benefit for the 924C by virtue of the plea agreement being introduced into evidence. But the question of whether or not you can impeach a witness who factually says I wasn't holding a gun with a – would be very misleading to put on a portion of the plea agreement which isn't inconsistent with that because he said he didn't hold the gun, the plea agreement assigns two points because somebody else did and he's responsible for it. And it would have been very difficult for us to go back and correct that because that's a – that's a legal issue. It's a legal question. And it's not – that's not one that's appropriately before – the jury shouldn't be tricked into thinking that Mr. Smart is being inconsistent. I'm really quite confused because basically he – what he was saying was I didn't have a gun, so I didn't get a benefit. But I did agree to be sentenced for brandishing a gun. Correct. So all they had to do was ask him that and he – the whole thing would have come out. He would have said, why did you agree to say that you were brandishing a gun? Did you just tell me you didn't have a gun? And he would have either said, well, I didn't have a gun but my codependent did or something, which would have at least started to have the jury understand what was actually going on here. Correct. But what the defense lawyer was attempting to do was – was textbook improper impeachment. It's not a – Why? Because it's not a contradictory statement. There's no statement that – that a two-point enhancement for brandishing a gun that doesn't contradict factually at all what the defendant – what the defendant said on the stand. I did not brandish a gun. But it contradicts the notion that he didn't get anything for the 924C because the same vicarious principles apply to both. And which was before the jury in the form of both plea agreements, the Pinkerton instructions that were argued by both sides, the fact that Mr. Sandler also said – Mr. Sandler – Mr. Sandler, the next witness, also said that there was a 924C, that he was charged with it. All the law – all the law was in front of the jury on this issue. You began by suggesting that it was important for some reason that there were two cooperators here. Is there anything that – if we thought there was a problem with this, with regard to the harmlessness question, is there anything that – are you arguing that Smart's testimony in particular was less valuable or not as valuable, or the things that were said to be attributed to him he actually didn't say, or what? And in other words, why did you begin by telling us that there were actually two cooperators? What's the relevance of that to the harmlessness error determination? Two reasons. One is the argument that was made to this Court was that both cooperators' cross-examination was somehow improper. I understand that. And now I'm asking for harmlessness purposes, can we distinguish Smart in some way that makes him harmless because there was another cooperator? Yes, Your Honor. And that's because what Mr. Smart and Mr. Sanders said is a factual matter. They were both – the testimony was independent of each other. They both were participants, hands-on participants in this robbery, and their testimony was in substance the same. So your basic argument is Smart didn't matter because they had Sanders. Is that basically what you're saying? Smart didn't matter because we had Sanders, because we had the DNA, because of the sequencing of Mr. Smart came in, told us certain things. That's been corroborated by physical evidence that is – The DNA – when you say it's been corroborated by physical evidence, that's the DNA that was found in the car. And around the car. On the car, right. A match on the gun, a match on the – Was there any DNA evidence that linked them to the bank, inside the bank? Well, yes, Your Honor. What? Well, they were seen running away from the bank by a helicopter. It was a high-speed pursuit. They were – through the entire pursuit, they were being followed by various helicopters in Southern California. The car then crashed – they're throwing money out the window that's on video. The car then crashes into the Baldwin Hills Mall. Everybody runs out. What's left behind are cash from the bank robbery. Were they identifiable from the helicopter? They were wearing ski masks. No, they were not. So the people in the helicopter couldn't say that was Johnson or that was Pritchard? Absolutely not. Absolutely not. What they could say later is they found a ski mask at the scene. They found a Superman hat at the scene, which was worn, I believe, in the bank. They found a gun at the scene. And there was DNA from inside the car. The gun, obviously, was inside the bank. It looked like the same gun according to the eyewitness testimony. The only testimony saying that it was, in fact, Pritchard and Johnson, though, came from the cooperating witnesses. The only testimony that says these guys were the ones who robbed the bank, yes. There's no eyewitness testimony besides those two. But the physical evidence is quite compelling that these guys were the ones who robbed the bank based upon the fact that they were in the getaway car, fling the bank at high speed, and then ran away once they crashed into Baldwin Hills Mall. And the stuff that was left behind in the getaway car are all the accoutrements of the bank robbery, a gun, a ski mask, cash. And there was DNA on that that linked them, Johnson and Pritchard? Mr. Pritchard's DNA was a trillion to one match on the inside of the car window that was being used to light it into the Baldwin Hills Mall. We believe his head hit the inside of the glass. Okay. So Mr. Johnson's DNA was on a Superman baseball cap. That's a million to one match. It was also on the gun, which was not as strong of a match, but still a match nevertheless. And it was also on the inside of the car. But I think Judge Orlow's original question was, was there any DNA at the bank itself? And the answer is no, correct? No, not that we obtained. Okay. You're over your time, but it's been a useful questioning. Is there any further questions from the panel? Thank you, Your Honor. Sorry. Thank you very much. Repuddle. First, Your Honor. Do you want to address the harmlessness question? I mean, if in fact these two people said the same thing and one of them didn't have an impeachment problem, is it true that Sanders didn't have an impeachment problem? It's not true. At page 682 of the ER, when counsel tried to sort of dip his toe back into this area again, again the specific guideline calculations were objected to, and that objection was sustained. The chronology is a little important because Smart testified first. It was during Smart's cross-examination by Pritchard's counsel that the admonishment that he's not here for sentencing and these issues are totally irrelevant occurred. So neither defense attorney was nearly as aggressive trying to get into those areas because they'd already been shut down and admonished in front of the jury when Sanders testified second. And then, as I said, the one time that he tried to sort of creep up on that issue again, he was shut down once more at page 682 in the record. Very quickly, just factually, Smart was not impeached. And I would argue that stating in closing what his plea agreement says is not the same thing as getting to actually impeach the witness on the witness stand with his own plea agreement because that was shut down at page 587. And it's also a fact that it wasn't just this brandishing enhancement. It was the guidelines generally. That was a couple pages earlier. The court said the document's in evidence. This is then repetitive. And then later, when defense counsel specifically said, may I inquire into the point system, Your Honor, he was told no, period, and then was forced to sit down. In my last moments, I'd just like to point out that the fact that there was a second trial is irrelevant. As to Mr. Johnson, he was convicted of all three counts in the first trial. But even as to Mr. Pritchard, I would say the first, the government has waived an argument that somehow there's a distinction between the first and the second trial. They didn't bring that up in the briefing, so we didn't respond to it. But perhaps more importantly, Mr. Pritchard as well suffered two convictions at the first trial and was robbed of the opportunity to perhaps get an acquittal at that first trial on count three, which hung. So given a fair trial, the results at the first trial could have been much, much differently, come out much differently. And then finally, Your Honors, the government takes some refuge in the notion that because Smart testified that he didn't understand himself to be getting a benefit, that somehow that ameliorates the being shut down on cross-examination or that somehow that makes things harmless. And I would suggest that that's actually a second troubling independent error, is that that's the Napui error, is that the government knew that he was testifying falsely about that. And not only did they not correct it, but they... Well, they didn't know. I mean, they didn't necessarily know that they might have known, but nothing that you've shown has proven that they knew, that he actually understood that he had a problem on the 924C. Well, I think his plea agreement shows that he does know that. Well, it shows that his lawyer thought he did and that he may have been at some risk, but he could have thought it was a very small one. I mean... Yeah, well, so I would respond to that twofold. First, I think factually it's very, very dubious that he didn't actually understand that to be a benefit. I think that the record taken as a whole suggests that Mr. Smart was just prevaricating about this. But let's assume for the sake of argument that he wasn't... He could have thought. He could have thought. They have no business charging him with a 924C, but they are charging him with a 924C. And who knows what's going to happen. And I, you know, I believe I would go to trial and I would win, but I've been advised by my lawyer not to take that risk. I don't think anything you've said or shown has demonstrated that he was lying about that. He was wrong about it, but lying is a different matter. Okay. Let's assume that he was just mistaken. The government has acknowledged that he was factually mistaken because the government even said here at the lectern today that he did get a benefit. That was part of the plea agreement that was drafted up. Once the government knows that he's getting a benefit and the cooperator testifies, let's say arguably mistakenly, that he's not getting a benefit, the law is clear under our en banc Hayes case that the government still bears an affirmative duty to correct false testimony, whether subjectively mistaken or whether actually pejorative. So why doesn't the plea agreement cure it? I'm sorry? Why doesn't the introduction of the plea agreement cure it? Because it doesn't show what it means. It's fairly insubordinate. You know, Hayes was different because they concealed the, in fact, the prosecutor misrepresented that there was a deal, told the judge there was no deal, and there was a deal. That's true. I mean, here, they say here's the deal. It's sort of an extension of an appeal to say now we have to explain to you what it means. Well, it's, I think first the plea agreement doesn't tell the whole story because somebody untrained in the law wouldn't be able to pick up just on the face of the plea agreement. But as to the actual fact that the defense lawyer was able to straighten that out at the closing argument and did, I mean, as to that fact, i.e., was he vulnerable under 924C, he wasn't able. Well, your opposing counsel says he should have been able, had he been clever, to demonstrate how much it was, i.e., seven years, because he could have used the other plea agreement. What about that? Well, I think that, number one, he didn't make that argument. So the jury didn't have that information. And I think that at best the defense counsel was left in a situation where he's arguing that the plea agreement says one thing, where the witness denied it, the government never corrected it, and, in fact, the judge, on top of all that, said it's totally irrelevant anyway because he's not here for sentencing. Admittedly, there's not the act of concealment, kind of the backroom deal that we had in the Hayes case. But footnote one of the Hayes decision does point out what was described as a real risk, that whether advertently or inadvertently, a cooperator's counsel might sort of encourage them to be ignorant about the terms of the deal. And it doesn't take a lot of imagination for a witness to be sort of gently coaxed into saying, well, I don't know the legalities of the plea, and then that being essentially unimpeachable. I think that that would be an enormous loophole, this subjective mistake. And the language that the government has to straighten out, false testimony, whether they elicited it or not, whether the witness is perjuring themselves or simply mistaken, when it's talking about objective benefits that they received, the government does still have an opportunity. Well, what should the government have done? I'm sorry? The government, I mean, it seems to me obvious that if it was in the plea agreement there was a benefit. To me it seems obvious. But, you know, I'm a judge. What should the government have done? For starters, they could have not objected when defense counsel went to impeach him with his plea. This was a case where it wasn't actually a sua sponte interruption for once. And I don't mean to sound snarky when I say that, but it's actually the record bears out there's many sua sponte interruptions. But in this one, when defense counsel was set up for a clean and accurate impeachment, that it was a benefit, and he started to have the witness turn to page 11, the government counsel stood up and objected. So affirmatively preventing. But you've heard the basis for his objection here, too. I mean, he said it was not only that, it was just inaccurate and it was a legal factual difference. I mean, there were other bases for objecting other than trying to conceal what was going on. But that's not what he said. He didn't say objection misstates the evidence. He didn't say objection. He didn't say any of those things. Rather, he said asked and answered, which was on the heels of Judge Rios saying this is totally irrelevant. So it was sort of the trial lawyer's prerogative of knowing that the judge is leaning one way and then saying asked and answered when, in fact, it was asked but it was never answered. So the basis of the objection was different than what's being represented. All right. Any further questions? Thank you. Both your arguments have been very interesting and enlightening. And the case will be under submission. Thank you very much, Your Honor.
judges: Thomas, Wardlaw, Berzon